UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:     ANDREA E. MULLOCK     :     Chapter 11
               Debtor(s)     :
                                       :     Bky. No. 08-16903ELF

# MEMORANDUM

## I. INTRODUCTION

Andrea A. Mullock ("the Debtor") is the owner of the real property located at 933 Black Road, Gladwyne, PA ("the Property"). She commenced this chapter 11 bankruptcy case on October 21, 2008. It is her second chapter 11 bankruptcy case.[1] Emigrant Mortgage Company ("Emigrant"), a secured creditor holding the first mortgage on the Property, filed a Motion for Relief from the Automatic Stay ("the Motion") on January 16, 2009. Emigrant seeks authority to enforce its prepetition foreclosure judgment obtained in federal court and to subject the Property to a marshal's sale. The sole basis for the relief Emigrant requests is 11 U.S.C. §362(d)(2).

The court held an evidentiary hearing on the Motion on February 11, 2009. Michael Mullock ("Mr. Mullock"), the Debtor's husband, was the sole witness. At the conclusion of the hearing, the court took the matter under advisement and requested that the parties submit post-hearing memoranda. Both parties did so on February 25, 2009. The matter is now ready for disposition.

For the reasons set forth below, the Motion will granted.

---

[1] The Debtor's first chapter 11 case was filed on November 29, 2005 and dismissed on November 7, 2007. See In re Andrea E. Mullock, Bky No. 05-39376-ELF ("the Prior Case").

-1-

## II. FINDINGS OF FACT[2]

1. The Debtor is woman in her late 40's who is legally blind and disabled as a result of a catastrophic accident she suffered in 1984.

2. The Debtor is dependent upon Mr. Mullock to conduct her financial and business affairs and, at all relevant times, he has done so on her behalf.

3. In 1987, the Debtor received a settlement in connection with certain litigation arising from her accident. The settlement had a value of approximately $3.5 million and was structured in the form of an annuity and cash.

4. The Debtor used some of the cash portion of the settlement for a down payment for the purchase the Property. The Debtor also used some of the cash portion of the settlement to invest in a business that Mr. Mullock operated ("the Earlier Business").

5. The Debtor is the sole owner of the Property and has lived there for more than twenty (20) years.[3]

6. There are two (2) structures on the Property: a residence and a carriage house.

---

[2] Several of the following Findings of Fact are based upon representations the Debtor made in her Amended Disclosure Statement filed in the Prior Case. See Bky. No. 05-39376 at Docket Entry No. 43. I may take judicial notice of the dockets of bankruptcy cases filed in this district and the content of the documents filed in such cases for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute. See Fed. R. Evid. 201; In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998). While I might not ordinarily accept the truth of factual information set forth in a debtor's filings, I refer to certain facts set forth in the Amended Disclosure Statement and bankruptcy schedules from the Prior Case to provide some context to the facts adduced at the hearing on the Motion. I do not understand Emigrant to dispute any of the factual information that I have derived from the Amended Disclosure Statement in the Prior Case.

[3] The record does not reveal the exact date of her purchase of the Property. Also, there was no evidence that the Property has been modified or customized to accommodate the Debtor's disabilities.

7. Some time in the mid-1990's, the Earlier Business ran into financial difficulties and ceased operations. The Debtor and Mr. Mullock experienced their own personal financial distress, resulting in the foreclosure and the Debtor's loss of ownership of the Property.

8. After the Debtor lost title to the Property, she and Mr. Mullock remained in possession of the Property through what she described as a "lease to purchase" agreement.

9. In 1999 and thereafter, the Debtor became the owner of two (2) related companies, Consolidated Woodwork Manufacturing of Delaware ("CWM") and Global Development, C.R, S.A. ("Global"). Mr. Mullock ran these new business ventures.

10. In April 2001, the Debtor entered into an adjustable rate mortgage transaction with Emigrant, borrowing the principal amount of $750,000.00. This loan enabled her to re-purchase and regain ownership of the Property.

11. Also in 2001, the Debtor entered into a loan transaction with Malvern Federal Savings and Loan ("Malvern"), in the form of a term loan and a line of credit, to provide financing for the business operations of CWM and Global. The Debtor granted Malvern a mortgage on the Property in that transaction.

12. Within one (1) or two (2) years after the Emigrant loan transaction, the Debtor became delinquent on the Emigrant loan.

13. Emigrant initiated foreclosure proceedings and obtained a judgment against the Debtor on May 31, 2005 in the amount of $1,140.130.49 (plus interest and late fees) in the U.S. District Court for the Eastern District of Pennsylvania, in a case docketed as C.A. No. 2:03-

CV-3910 ("the District Court Foreclosure Case").[4] Thereafter, Emigrant scheduled a marshal's sale of the Property.

14. Prior to the scheduled marshal's sale, the Debtor filed the Prior Case on November 29, 2005.

15. The Debtor's bankruptcy schedules in the Prior Case revealed the following:

   a. The estimated value of the Property was $1,800,000.00.

   b. The Property was subject to two (2) mortgages with a total indebtedness of $1,400,000.00: a first mortgage in favor of Emigrant in the amount of $1,150,00.00[5] and a second mortgage in favor of Malvern in the amount of $250,000.00.[6]

   c. Emigrant and Malvern were the only creditors.

   d. The Debtor had projected monthly income of $18,578.00,[7] monthly expenses of $15,248.03 (including $6,000.00 as a monthly mortgage payment to Emigrant and $2,807.20 as a monthly mortgage payment to Malvern).

   e. The Debtor projected $3,329.97 in positive monthly cash flow.

---

[4] See Attachment to Proof of Claim No. 2 filed on February 24, 2006 in the Prior Case.

[5] In the Prior Case, Emigrant filed a proof of claim in the amount of $1,189,400.34. Emigrant also asserted that the prepetition arrears were at least $490,238.93.

[6] Malvern did not file a proof of claim in the Prior Case. In her Amended Disclosure Statement, the Debtor stated that, as of June 15, 2006, her aggregate indebtedness to Malvern was in excess of $290.000.00. See Amended Disclosure Statement at 6, Prior Case Docket Entry No. 43.

[7] The Amended Disclosure Statement in the Prior Case stated that the income was derived from:

| | | |
|---|---|---|
| (1) Social Security | $ | 881.00 |
| (2) Annuity | $ | 5,697.00 |
| (3) Loan repayments from CWM | | $12,000.00 |

See Schedules A-J, Prior Case Docket Entry No. 20.

16. By order dated October 25, 2006, the court confirmed the Debtor's Second Amended Chapter 11 Plan ("the Confirmed Plan") in the Prior Case. See Prior Case Docket Entry No. 71.

17. The Confirmed Plan obligated the Debtor to make regular monthly payments on the Emigrant loan and to satisfy the entire indebtedness on or before December 31, 2007. The Confirmed Plan also required the Debtor to satisfy her entire indebtedness to Malvern by the same date. See Debtor's Second Amended Chapter 11 Plan, Article IV, §§1-2, Prior Case Docket Entry No. 66.

18. The Debtor was unable to procure financing to satisfy the Emigrant and Malvern obligations by the December 31, 2007 deadline set forth in the Confirmed Plan.

19. The Debtor also defaulted on her obligation to make regular monthly mortgage payments to Emigrant under the Confirmed Plan, which caused Emigrant to file a Motion to Dismiss the Prior Case on November 6, 2007.[8] See Prior Case Docket Entry No. 100.

20. The Debtor consented to Emigrant's Motion to Dismiss and the court dismissed the Prior Case by Order dated November 7, 2007. See Prior Case Docket Entry No. 104.

21. After the dismissal of the Prior Case, Emigrant's filed a motion to reassess damages in the District Court Foreclosure Case. That motion was granted and, on June 6, 2008, the District Court entered an amended judgment for foreclosure in the amount of

---

[8] In its Motion to Dismiss, Emigrant alleged that the post-confirmation mortgage account was delinquent back to February 2007 and that the Debtor made no payments at all after April 2007. At the February 11, 2009 hearing in the Present Case, Mr. Mullock disputed the accuracy of Emigrant's accounting of the post-confirmation payments, but did not deny that the Debtor missed some monthly instalment payments falling due between October 2006 and November 2007.

$1,366,419.17, plus interest from November 1, 2007 through April 22, 2007 in the amount of $58,392.20, plus interest at the rate of 18%, $ 356.05 per diem, from April 22, 2008, until the judgment is satisfied, plus post-judgment attorneys fees and costs in the amount of $ 34,141.25.

22. The Debtor appealed the District Court's June 6, 2008 order to the Court of Appeals.

23. Emigrant renewed execution proceedings and a marshal's sale of the Property was scheduled following the entry of the June 6, 2008 order in the District Court Foreclosure Case.

24. On September 17, 2008, the District Court denied the Debtor's Motion to Stay Marshal's Sale, precipitating the Debtor's filing of the present chapter 11 bankruptcy case on October 21, 2008.

25. The Debtor's Schedules in the present case reveal the following:

    a. The estimated value of the Property, $1,165,000.00, a decrease of more $600,000.00 from the value listed in the schedules in the Prior Case.

    b. The aggregate indebtedness arising from the Emigrant and Malvern mortgages against the Property is $1,597,000.00 (the debt to Emigrant being $1,347,000.00[9] and the debt to Malvern being $250,000).

    c. Emigrant and Malvern are the only creditors listed in the Debtor's schedules in the present case other than a small debt to the United States Internal Revenue Service ($300.00).[10]

    d. The Debtor projects her monthly income to be $26,578.00, with $15,469.22 in

---

[9] Emigrant has filed a secured proof of claim for an even higher amount: $1,484,171.49, with prepetition arrears of $779,599.54. See Proof of Claim No. 2 filed December 1, 2008.

[10] LVNV Funding LLC was not scheduled but has filed two (2) general unsecured proofs of claim. The two (2) claims total $1,914.57.

      current living expenses. The expenses include $8,282.02 as a monthly mortgage payment to Emigrant and $2,807.20 as a monthly mortgage payment to Malvern.

    e. The Debtor has projected $11,108.78 in positive monthly cash flow.[11]

See Schedules A-J (Docket Entry No. 26).

26. As of the February 11, 2009 hearing, the Debtor had paid all of the mortgage payments to Emigrant that fell due since filing the filing of the present case.

27. As of the date of the February 11, 2009 hearing, the Debtor had not filed a proposed chapter 11 plan of reorganization.[12]

28. Presently, Global is the source of the Debtor's business income.[13]

29. Global's business is the manufacture of windows and doors for installation in "historic" and "high end" institutions and properties.

30. All of Global's manufacturing operations are located in Costa Rica.

31. Mr. Mullock uses the cottage on the Property as his business office. In addition, the cottage serves as a kind of "show house" because certain Global products have been installed there. This permits customers to see how the products look generally and, in particular, how their appearance "ages" in the local climate.

---

[11] In his testimony, Mr. Mullock attributed the increased monthly income of approximately $8,000.00 from the Prior Case to cost reductions he achieved in his operation of Global. Presumably, these savings permit the Debtor and Mr. Mullock to draw increased revenue from Global's business operations. In Schedule I, the Debtor labels the increased revenue as "income from real property" and "interest and dividends."

[12] At the February 11, 2009 hearing, Mr. Mullock testified that the Debtor could file a proposed chapter 11 plan within thirty (30) days. As of the date of this Memorandum, April 14, 2009, the Debtor has not done so.

[13] Mr. Mullock's testimony suggested that all of the business income available to him and the Debtor currently is derived from Global. It is unclear what role, if any, that CWM plays currently in generating income for the Debtor and Mr. Mullock.

### III. CONCLUSIONS OF LAW

1. The Debtor lacks equity in the Property.

2. The Property is not necessary to an effective reorganization.

3. Emigrant is entitled to relief from the automatic stay under 11 U.S.C. §362(d)(2).

### IV. DISCUSSION

#### A.

Section 362(d)(2) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay —
>
> * * *
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization . . . .

11 U.S.C. §362(d)(2).

Under 11 U.S.C. §362(g)(1), Emigrant has the burden of proving the absence of equity. The Debtor has the burden on all other issues. Id. §362(g)(2).

At the beginning of the hearing on the Motion, the parties stipulated that the Debtor lacks equity in the Property within the meaning of §362(d)(2).[14] Therefore, the only remaining issue is

---

[14] For purposes of §362(d)(2), a debtor lacks equity in secured property if "the value of the collateral is less than the sum total of all of its liens." See In re Colonial Center, Inc., 156 B.R. 452, 459 (Bankr. E.D. Pa. 1993); see also In re Indian Palms Assocs., 61 F.3d 197, 206-07 (3d Cir. 1995). According to the Debtor's bankruptcy schedules, the Property has a fair market value of $1,165,000.00 and is subject to two (2) liens totaling $1,597,000.00. See Finding of Fact No. 25.

whether the Property is "necessary to an effective reorganization." The Debtor bears the burden on the issue. Id. §362(g)(2).

In their post-hearing submissions, both parties have cited United Sav. Ass'n. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 108 S.Ct. 626 (1988) and acknowledged that the §362(d)(2) concept of being "necessary to an effective reorganization" means more than that the debtor needs the property to pursue the reorganization effort. For the Debtor to satisfy her burden under §362(d)(2)(B), she must establish not only (1) that the Property is needed in her reorganization, but also (2) that there is "a reasonable possibility of a successful reorganization within a reasonable period of time" Timbers, 484 U.S. at 376, 108 S.Ct. at 633.[15]

**B.**

The parties devote most of their arguments to the first requirement under §362(d)(2)(B), i.e., whether the Property is "necessary" to the Debtor's attempted reorganization.

The Debtor argues that: (1) this case should be treated as a "single asset" bankruptcy case, subject to the Third Circuit's observation that in single asset chapter 11 cases, the debtor's property "will almost always be necessary for reorganization," In re Indian Palms Assocs., 61 F.3d at 209; and alternatively, (2) the Property is necessary to the Debtor's reorganization due to its use as her residence.[16]

---

[15] The second requirement itself may itself be conceptualized as having two (2) parts: a plan feasibility component (i.e., reorganization is possible) and a temporal component (i.e., within a reasonable time).

[16] The Debtor argues that: (1) in an individual chapter 11 case in which the debtor's purpose is to save his or her home from foreclosure, §362(d)(2)(B) should be applied in the same manner as in chapter 13 cases and (2) in chapter 13 cases, courts should give the rehabilitative purposes of chapter 13 proper weight by presuming that a debtor's residence is "necessary" under §362(d)(2)(B). See Debtor's Brief at 5-11 (citing, inter alia, In re Rudd, 1995 WL 314493 (D.D.C. Apr. 12, 1995); Grundy Nat'l Bank v. Stiltner, 58 B.R. 593 (W.D. Va. 1986)). The Debtor acknowledges that there is

In response, Emigrant argues (1) the Property is not the Debtor's sole asset (or even the Debtor's most valuable asset) and that therefore, Indian Palms Assocs. is inapposite; (2) the need for the Property in the Debtor's reorganization should be evaluated by considering the role it plays in producing income and (3) the Property is not unique simply because Mr. Mullock has an office "in the home," especially in light of the fact that Global's primary business operations are in Costa Rica; and (4) the nexus between the Property and the Debtor's ability to generate income from her interest in Global is too attenuated to support a finding that the Property is necessary to the Debtor's reorganization.

However, as explained below, I find it unnecessary to resolve the parties' thoughtful debate concerning the necessity of the Property to the Debtor's reorganization because the Debtor has not met her burden with respect to the second issue under §362(d)(2) – whether there is a reasonable possibility of achieving an effective reorganization within a reasonable period of time.

### C.

As the Debtor properly cautions, her burden to establish that there is a reasonable possibility of achieving a reorganization within a reasonable period of time should not transform a §362(d)(2) hearing into a confirmation hearing. See, e.g., John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 157 (3d Cir. 1993). Rather, a debtor need only show that confirmation of a plan is "within the realm of possibility," In re Thornwood Assocs., 161

---

contrary authority in which courts have evaluated the "necessity" of the residence to the chapter 13 rehabilitation by considering whether "retention of the home is necessary for reorganization because no comparable housing is available or because the home is necessary to the debtor's business." In re Lippolis, 228 B.R. 106, 113 (E.D. Pa. 1998). Despite the testimony elicited from Mr. Mullock during the hearing regarding the use of the carriage house in Global's business, the Debtor devotes almost no space in her brief arguing that the Property is needed by Global and, for that reason, is necessary to the Debtor's reorganization.

B.R. 367, 368 (Bankr. M.D. Pa.), aff'd, 162 B.R. 438 (M.D. Pa. 1993), or that a proposed plan "is not patently unconfirmable and has a realistic chance of being confirmed." In re 266 Washington Assocs., 141 B.R. 275, 281 (Bankr. E.D.N.Y.), aff'd, 147 B.R. 827 (E.D.N.Y. 1992).

Even considering the less stringent standard that may apply at this relatively early stage of the chapter 11 case, I am not convinced that the Debtor can propose a plan that has a sufficiently realistic chance of being confirmed within a reasonable time to warrant maintaining the automatic stay in place over Emigrant's opposition under §362(d)(2).

The Debtor presented a general summary of her likely plan of reorganization at the February 11, 2009 hearing. Essentially, she contemplates utilizing her projected business and non-business income stream over a ten (10) year period to maintain contractual payments and cure the prepetition delinquency on both the Emigrant and Malvern mortgages. See 11 U.S.C. §1123(a)(5)(G) (a chapter 11 plan shall provide the means for its implementation such as "curing or waiving . . . any default"); id. §1124(2) (plan treatment that cures a default does not "impair" the claim).

The proposed treatment of Emigrant and Malvern may be summarized as follows:

| Claimant | Amount | Treatment |
|---|---|---|
| Emigrant | $779,000.00 [prepetition arrears] plus 6% interest = $825,740.00 | Through plan: $6,881.16/month |
| Malvern | 100,000.00 est. | Through plan: $833.33/month |
|  |  |  |
| Total | $925,740.00 | $7,714.49/mo. x 120 months |

See Exhibit D-3.

I find this proposal flawed.

The Debtor's expectation that her income will support the continued maintenance of both mortgages, plus an additional $7,714.49 in plan payments per month for a period of ten (10) years is unrealistic. The total debt service involved is nearly $19,000 per month.[17] I am aware that the Debtor produced bankruptcy schedules stating that her current monthly net income (i.e., current income minus current expenditures) is $11,108.78,[18] an amount that appears sufficient to support the proposed $7,714.49 plan payment. However, I am unable to credit the Debtor's projections.

There is nothing in the Debtor's financial history suggesting she can support debt service on her home at a level that exceeds $225,000.00 per year.[19] Prior to the filing of this bankruptcy case, her income was either inadequate or unreliable, resulting in extended periods of time in which she was unable to pay her regular monthly mortgage payment, let alone an additional monthly payment to cure the mortgage arrears.

The feasibility of the Debtor's reorganization theory is entirely dependent on her assertion that Global's structural change in business operations will generate profits at a level sufficient to permit the Debtor to increase her draw from Global to approximately 167% above historical

---

[17]
| | | |
|---|---:|---|
| | $8,282.82 | Emigrant regular monthly payment |
| | 2,807.20 | Malvern regular monthly payment |
| | 6,881.16 | Emigrant monthly cure payment |
| + | 833.33 | Malvern monthly cure payment |
| | **$18,804.51** | **TOTAL MONTHLY OBLIGATION** |

[18]     See Schedules I and J, Docket Entry No. 26.

[19]     According to her Statement of Financial Affairs, her total annual income from all sources for calendar years 2006 and 2007 was approximately $223,000.00 and she was on track to enjoy the same level of income in 2008 when she filed this bankruptcy case in October. See Present Case Statement of Financial Affairs ¶2 (Docket Entry No. 26). Obviously, this level of income is inadequate to fund the reorganization plan the Debtor has floated.

levels – an increase of almost $100,000.00 per year.[20] I am dubious that this stated increase either exists or, if it presently does exist, is sustainable over time for several reasons.

First, the Debtor has not presented any concrete evidence that her purported increased income since the Prior Case is based in reality. If the Debtor's net monthly income is really $11,108.78, then the Debtor should have accumulated more than $30,000.00 during the three (3) months between the filing of this bankruptcy case in October 2008 and the February 11, 2009 hearing. Yet, she came forward with no evidence that she has such savings at the hearing.[21] Nor do her Monthly Operating Reports confirm that her Schedule I and J projections have been borne out in the first five (5) months of this case.[22]

Second, it appears that the Debtor has understated her expenses. See Present Case

---

[20] The Debtor has increased her projection of the various kinds of "draw" received from Global from $12,000.00 per month to $20,000.00 per month. The increase is represented to be a total of $8,000.00 in "income from real property" (i.e., rent) and "interest and dividends." See Schedule I, Docket Entry No. 26.

[21] If the Debtor's income during the first few month of the case corresponded to her Schedule I projections and if she had a substantial cash accumulation, I would have expected her to volunteer that information at trial in support of her position there is a reasonable possibility of achieving an effective reorganization within a reasonable period of time. By her silence, I draw the contrary inference.

[22] The Debtor's Monthly Operating Reports for the months through February 2009 do little more than mirror the information on Schedules I and J. Nor has the Debtor attached any bank statements to corroborate the reports. See Docket Entry Nos. 34, 35, 36, and 42. The form and content of the Monthly Operating Reports are controlled by the U.S. Trustee. See 11 U.S.C. §1106(a)(1) (incorporating Id. §704(a)(8)); 28 U.S.C. §586(a)(3)(D), (G). It appears that the Debtor has not used the form of Monthly Operating Report typically mandated by U.S. Trustee in this district for individual debtors. Those forms require that the Debtor's bank statements be attached. See, e.g., In re Petropoulis, Bky. No. 06-13914ELF (Docket Entry No. 253).

I also note that the Debtor's most recently filed Monthly Operating Report discloses monthly income for February 2009 of $14,717.00, an amount that is roughly one-half of the income projected in Schedule I and reported in the Monthly Operating Reports for November 2008 through January 2009. See Docket Entry No. 42.

Schedule J (Docket Entry No. 26).[23] This casts doubt on the general reliability of her income and expense statement.

Finally, I cannot ignore this case's historical context. Were this the Debtor's first attempt at reorganization, I might accept more easily the Debtor's very optimistic income projections at this early stage of the case, particularly in the absence of a vigorous challenge to their reliability by Emigrant. However, the proposition that the debtor need not make a detailed showing regarding plan feasibility in defending a §362(d)(2) motion prior to confirmation has less force when there was a prior failed reorganization attempt. See In re Elliott-Cook, 357 B.R. 811, 815 (Bankr. N.D. Cal. 2006) (cited in In re Ferguson, 376 B.R. 109, 121 (Bankr. E.D. Pa. 2007)) (observing that the court must consider why prior reorganization effort(s) failed and what has changed to make present effort likely to succeed). If there has been a long history of financial default and one or more prior failed reorganization attempts, "the evidence needed to demonstrate a material change in circumstances supporting a reasonable possibility of reorganization grows heavier." In re Dawson, 2007 WL 4190772, at *3 (Bankr. E.D. Pa. Nov.

---

[23]   For example, the monthly cost of electric and heat for the Property (which has two (2) buildings) is listed as $250.00. Yet, on her Monthly Operating Reports, she has disclosed electricity and heat costs of $1,270.00 (November 2008), $970.00 (December 2008), $620.00 (January 2008) and $740.00 (February 2008). Even considering that these are winter expenses when hearing costs are higher (although air conditioning costs for electricity may be lower), these disclosures suggest that the line item on Schedule J is low. Another example is the amount listed for monthly transportation expenses for the Debtor and Mr. Mullock ($100.00). This amount seems understated substantially .

I note further that the Debtor makes no allowance for the payment of any federal, state or local income taxes. To the extent that her monthly income is derived from an annuity and "loan repayments" from Global, perhaps she is correct that she has no tax liability. But she categorizes the approximate $8,000.00 per month increase in income as "income from real property" and "interest and dividends." This income would appear to be taxable income. Perhaps there is some reason why it is not (e.g., offsets for prior losses), but the Debtor has come forward with no explanation and I am reluctant to assume that the Debtor may utilize all of this income tax-free.

20, 2007).[24]

Here, the Debtor's mortgage account with Emigrant has been in default for six (6) years or more. Emigrant obtained a judgment and first initiated execution proceedings almost four (4) years ago. Since commencement of the Prior Case in 2005, the Debtor made some monthly mortgage payments to Emigrant, but not consistently. Indeed, the default on the mortgage, which was more than $490,000.00 as of the commencement of the Prior Case, grew to more than $779,000.00 by the time the Present Case was filed. See nn. 5, 9 supra.

In light of this history, which includes the Debtor's default on her monthly mortgage payments to Emigrant after plan confirmation in the Prior Case, I am skeptical about the Debtor's ability to carry out the terms of the proposed reorganization plan; particularly in light of the uncorroborated, self-serving evidence the Debtor presented in support of its feasibility.[25] After considering the evidence, I have no confidence that this is a case in which the Debtor has solved a long-standing financial problem with a long-term solution. Rather, the evidence suggests that the Debtor's post-petition payments to Emigrant are simply part of the historical pattern of

---

[24] Elliot-Cook involved a debtor's motion to extend the automatic stay under 11 U.S.C. §362(c)(3). Ferguson involved a debtor's motion to impose an "automatic" stay under §362(c)(4). Dawson involved a debtor's request for leave to file a new bankruptcy case after entry of an order restricting the debtor's right to file without leave of court due to prior, unsuccessful filings. In all of these contexts, as under §362(d)(2), the court is obliged "to conduct an early triage of a case to determine if the case has a reasonable likelihood of success." In re Charles, 334 B.R. 207, 219 (Bankr. S.D. Tex. 2005).

[25] In light of this conclusion, I need not decide whether, as a matter of law, the proposed plan "patently violates the Code's requirements for confirmation," John Hancock Mut. Life Ins. Co., 987 F.2d at 157, because it proposes a cure for a period lasting ten (10) years. I am unaware of, and the Debtor was unable to cite, any reported decision confirming a plan providing for a cure of such a duration. There is authority suggesting that Emigrant would be entitled to vote on such a plan, notwithstanding the proposed cure under 11 U.S.C. §1124(2). See In re Jones, 32 B.R. 951 (Bankr. D. Utah 1983) (cure of default under §1124(2) must be completed by the effective date of the plan to avoid impairment of claim). While I do not decide the issue, there is some doubt whether such a plan could be confirmed over Emigrant's rejection of the plan and objection to confirmation under §1129(b).

intermittent performance of her contractual obligations and that there is no reasonable probability that the Debtor will be able to generate income for a sustained period at a level sufficient to repay the enormous delinquency that has accrued on the Emigrant mortgage.

In short, in a case in which the Debtor proposes to fund her reorganization plan through an alleged dramatic increase in income and where confirmability and feasibility are at issue and a prior reorganization effort was unsuccessful, the Debtor has failed to make a satisfactory showing that her circumstances have changed sufficiently to establish that (1) an effective reorganization is probable within a reasonable period of time and therefore, (2) the automatic stay should be maintained as to a property that lacks equity.[26]

## V. CONCLUSION

For the reasons set forth above, Emigrant's Motion for Relief from the Automatic Stay will be granted. An appropriate order will be entered.

**Date:** April 14, 2009

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

---

[26] The Debtor also argues that even if the proposed plan for curing the Emigrant and Malvern mortgage defaults is inadequate, "a second plan could be proposed providing for similar payments but with a 5 year balloon." Debtor's Brief at 4 n.1. This alternative is more economically feasible because it does not mandate monthly plan payments of more than $7,700.00. However, this is similar to the failed plan confirmed in the Prior Case. This "second plan" is inadequate because: (1) I remain unconvinced regarding the Debtor's ability to maintain regular monthly mortgage payments for an extended period of time; and (2) the Debtor has not explained why another effort to refinance will succeed when the Debtor's effort in 2007 was unsuccessful.